## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

IN THE MATTER OF THE COMPLAINT,

Of

MILLER MARINE SERVICES, INC., as
Owner of the motor vessel *Megan T. Miller*, an
83.5 foot Launch Boat, for Exoneration from
or Limitation of Liability,

Plaintiff.

Civil Action No.
3:13 - CV - 1348 (CSH)

**JUNE 17, 2014**

### RULING ON CLAIMANTS' MOTION TO INCREASE LIMITATION FUND

**HAIGHT, Senior District Judge:**

In this admiralty case, a shipowner has filed a complaint for exoneration from or limitation of liability for personal injuries suffered by an individual while disembarking from a launch owned by the plaintiff shipowner. That individual, together with his wife, have filed a claim in this action (collectively "the Claimant"). Claimant has filed a motion [Doc. 37] pursuant to Rule F(7) of the Supplemental Admiralty Rules seeking two forms of relief: (1) to increase the limitation fund by requiring the surrender of additional vessels; and (2) to increase the security previously posted by petitioner in respect of the vessel specified in the complaint.

Plaintiff opposes both aspects of the Claimant's motion. This Ruling resolves the issues raised by the motion, as well as an additional issue implicated by the briefs of counsel.

1

## I. BACKGROUND

The plaintiff in this admiralty proceeding is Miller Marine Services, Inc. ("Miller Marine"), as owner of the motor vessel *Megan T. Miller,* an 83.5 foot launch boat.

Just after midnight on September 16, 2001, Thomas Walker, a Connecticut-licensed ship's pilot, fell off the deck of the *Megan T. Miller* while attempting to access a wharf at a port facility in New Haven, Connecticut.  Earlier that evening, Walker had directed the anchoring of a vessel at the Riverhead anchorage on Long Island Sound.  Walker was then picked up by a Miller Marine launch boat, the *Abigail Miller*, for transport to a wharf Miller Marine used for its operations in New Haven. Miller Marine owned the *Abigail Miller.* On the night in question, that vessel was operated by John Handley and crewed by deckhand Dwayne Popkin.

Upon the *Abigail Miller*'s arrival in the area of the New Haven wharf, she was made fast alongside the *Erin E. Miller*, another boat owned by Miller Marine, which was itself positioned alongside the *Megan T. Miller*, which was in turn anchored with her starboard side directly next to the wharf, in the vicinity of an access ladder to the dock.   Walker intended to climb up that ladder to the dock  and begin the trip to his home in Delaware.  As the result of the placement of the three tied-up Miller boats, Walker was required to cross the decks and gunwales of all three ( the *Abigail,* the *Erin,* and the *Megan*) in darkness in order to reach dry land.

Walker negotiated his way across the decks of the first two boats without incident.  He then fell through an opening in the starboard gunwale of the *Megan T. Miller* and into the water between that boat and the wharf.  Walker managed to make his way to the ladder and pull himself up to the wharf.  He claims that as a result of this incident, he suffered serious injuries.

Litigation ensued.  On November 16, 2012, Miller Marine, as owner of the launch boat

*Megan T. Miller*, filed a complaint in admiralty in the Eastern District of New York pursuant to the Limitation of Liability Act, 46 U.S.C. §§ 30501-30512 (the "Limitation Act"). Following the practice in limitation cases, Miller Marine prayed for an exoneration from liability for any damages caused by the incident, or for limitation of that liability to the value of the *Megan*. As required by the Limitation Act, Miller Marine posted a security bond with the court. The bond was in the amount of $515,000, that being the appraised value of the *Megan T. Miller* as determined by an experienced maritime appraiser and surveyor. The case was assigned to Judge Dearie, who on December 11, 2012 issued the customary Limitation Act order approving the posted security, directing that notice of the limitation action be published to potential claimants, and enjoining any other suits arising out of the incident.

On December 17, 2012 Thomas Walker and his wife, Gail Walker, filed a complaint against Miller Marine in this District Court, claiming injuries caused by the incident. The case bears Docket No. 3:12-cv-1761 and is assigned to Judge Shea. In that action, the Walkers assert diversity jurisdiction and demand a jury trial. In an order dated September 6, 2013, Judge Shea referred to Judge Dearie's injunction in the Eastern District of New York limitation action "which stays this action," and directed the District of Connecticut clerk to "administratively close this case without prejudice to reopening if appropriate." No steps have been taken in the action before Judge Shea since that date.

The Walkers made a motion in the Eastern District of New York to dismiss Miller Marine's limitation complaint on the basis of improper venue, or in the alternative, to transfer the case to this District. In a thoughtful opinion reported at 2013 WL 5460937 (E.D.N.Y. Sept. 30, 2013), Judge Dearie denied the motion to dismiss, and granted the motion to transfer. In consequence, this

3

admiralty limitation proceeding has been transferred to this Court, where it is now pending before me under docket number 3:13-cv-1348. Thomas Walker and Gail Walker have filed claims in this admiralty proceeding. Her claim is derivative of his, and I will sometimes refer to them collectively as the "Claimant." The injunction and stay order imposed by Judge Dearie when the case was before him remains in effect. As Judge Shea recognized in the Walkers' common law action against Miller Marine, that injunction bars proceedings in the action before him.

Claimant has filed a motion [Doc. 37] in this proceeding to increase the security posted by Miller Marine, on the ground that the $515,000 amount does not adequately reflect the value of Miller Marine's interest in the *Megan T. Miller*. Claimant also moves to increase the statutory limitation fund to include the values of the *Erin E. Miller* and the *Abigail Miller*, on the asserted ground that "each vessel was jointly and independently at fault in causing Captain Walker's injuries." Miller Marine opposes this motion in its entirety.

This Ruling decides both motions. It also considers a third issue raised by the briefs of counsel: Whether, and on what terms, the stay of proceedings imposed by this limitation court, sitting in admiralty, should be lifted to allow the common-law action pending before Judge Shea to proceed. I consider these issues in that order.

## II.  DISCUSSION

### A.    The Amount of Security for the Value of the *Megan T. Miller*

Limitation Act practice is governed by Supplemental Admiralty Rule F. Rule F(1) provides that at the time a vessel owner files a complaint under the Act, the owner

> (a) shall deposit with the court, for the benefit of claimants, a sum equal to the amount or value of the owner's interest in the vessel and

> pending freight, or approved security therefor, and in addition such
> sums, or approved security therefor, as the court may from time to
> time fix as necessary to carry out the provisions of the statutes as
> amended . . . [1]

In the case at bar, when Miller Marine filed its limitation complaint it "also posted a $515,000 bond with the court, an amount equal to the *Megan T. Miller*'s appraised value"; Judge Dearie entered his initial order *inter alia* "approving the posted security," 2013 WL 5460937, at *1.

That appraised value of the *Megan T. Miller* is evidenced by a sworn appraisal, Doc. 60-2, executed by Claudio Crivici, the president of Castlerock Risk Services, LLC, a marine casualty and insurance agent located in Amityville, N.Y. Crivici is a member of the National Association of Marine Surveyors (NAMS) and is a Certified Marine Surveyor (CMS). According to its website,[2] NAMS is a professional organization, established in 1962, that certifies marine surveyors. "From pleasure boats and yachts to commercial ships, NAMS Global marine surveyor members survey new and used vessels to determine their condition and value." The Certified Marine Surveyor, or CMS, is the highest-ranked category certified by NAMS. "NAMS Certified Marine Surveyors must have served as professional marine surveyors for not less than five years, or have served as professional marine surveyors for not less than two years and have substantial experience in the marine industry that is closely related to the technical requirements of marine surveying (shipyard superintendents, Coast Guard or Ship Classification Society field inspectors engaged in vessel inspection, individuals actively involved in boatbuilding and vessel repair, etc.)." Certified Marine Surveyors conduct

---

[1]   As an alternative way of giving security, Rule F(1)(b) allows a vessel owner to transfer to a court-appointed trustee, for the benefit of claimants, the owner's interest in the vessel. In the case at bar, Miller Marine did not avail itself of that option.

[2]   *See* www.namsglobal.org (visited June 8, 2014). The quotations in the accompanying paragraph of text are taken from that NAMS website.

themselves in compliance with the Uniform Standards of Professional Appraisal Practice (USPAP), which "provides a minimum set of quality control standards for the conduct of appraisals in the U.S.," and "requires that appraisers be familiar with and correctly utilize those methods which would be acceptable to other appraisers familiar with the assignment at hand and acceptable to the intended users of the appraisal."[3]

 Crivici's sworn appraisal of the *Megan T. Miller* is dated October 22, 2012.  The document recites Crivici's membership in NAMS, and states that

> on October 18, 2012 I appraised the "MEGAN T. MILLER" afloat at Miller Marine Services, Port Jefferson NY in conformity with the Uniform Standards of Professional Appraisal Practice.

The document sets forth the hull and engine particulars of the vessel, and concludes:

> Based upon my knowledge of the fair market value for vessels of similar size and characteristics as the "MEGAN T. MILLER," I value the vessel "MEGAN T. MILLER" on the date of the alleged incident of September 16, 2011 at $515,000.00 (Five Hundred and Fifteen Thousand Dollars).

Pursuant to Rule F(1)(a), Judge Dearie fixed the amount of $515,000 as the value to be surrendered in the limitation proceeding, approved a bond in that amount as security, and issued the customary Limitation Act injunction against other actions and proceedings against Miller Marine arising out of the incident, in accordance with Rule F(3).

 Claimant's present motion contends that this amount is inadequate and should be increased by this Court's order.  Claimant's standing to seek that relief is conferred by Admiralty Rule F(7), which begins by providing: "Any claimant may by motion demand that the funds deposited in court

---

[3]  This  last quotation is taken from a Wikipedia article on the USPAP (visited on June 8, 2014).  *See* http://en.wikipedia.org/wiki/Uniform_Standards_of_Professional_Appraisal_Practice.

or the security given by the plaintiff be increased on the ground that they are less than the value of the plaintiff's interest in the vessel and pending freight." In a case such as this one, where ownership of the *Megan T. Miller* resides in plaintiff Miller Marine alone, the "value of the plaintiff's interest in the vessel" is determined by the value of the vessel, usually established by appraisal. Miller Marine has given security in the amount of $515,000, based upon the Crivici appraisal. Claimant says in his brief [Doc. 37-1] at 3 that "the amount of this security is insufficient because it does not accurately represent the full value of the Megan T. Miller. The Megan T. Miller has a value between seven hundred thousand dollars ($700,000.00) and one million dollars ($1,000,000.00)." That range is based upon an unsworn written report dated October 2, 2013, signed by Captain Stephen A. Richter of Philadelphia, PA,, who describes himself as "Master Mariner and Pilot." Claimant's brief continues: "Given the disparity between the posted security and Movant's [Claimant's] appraisal, this Court should order an independent appraisal of the Megan T. Miller to be performed by a qualified vessel appraiser." *Id*.

That procedural request by Claimant misconstrues Rule F(7). The Rule provides that in the event of a demand by a claimant that the limitation security be increased, "the court shall cause due appraisement to be made of the value of the plaintiff's interest in the vessel and pending freight; and if the court finds that the deposit or security is either insufficient or excessive it shall order its increase or reduction." "Due appraisement," as that phrase is used in the Rule, does not mean (as Claimant appears to believe) that whenever a claimant demands increased security on the basis of a differing and higher appraised value – however qualified or unqualified the second appraiser may be, or how probative his opinion – the district judge is required to find and retain "a qualified vessel appraiser" to conduct "an independent appraisal" of the vessel. An "appraisal" of a vessel's value is

7

what a qualified appraiser makes.  "Due appraisement" of a vessel's value is what a district judge makes after conducting an evidentiary hearing.  "If the issue of valuation is contested, it is appropriate for the court to hold a hearing and receive proofs."  29 *Moore's Federal Practice,* § 708.01 [5] (Matthew Bender 3d ed.).  The hearing is subject to the Federal Rules of Evidence, which apply to "civil cases and proceedings, including . . . admiralty, and maritime cases."  Fed. R. Evid. 1101(b).

These principles pose problems for the Claimant at bar, because the Federal Rules of Evidence include Rules 702-05, which govern testimony by expert witnesses.  The expert witness rules apply to this case because marine appraisers are experts, or should be.  A district judge sitting in admiralty, whatever his or her virtues or vices, needs expert opinion help "to determine a fact in issue," Rule 702(a): the fair value of a vessel, as determinative of the amount of security in a Limitation Act proceeding.

Moreover, an opinion offered on that fact must be admissible under the Rules of Evidence. In determining admissibility, the district judge is mandated to perform the "gatekeeper" function articulated by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993): "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  *Id*. at 592-93.   Fed. R. Evid. 702 was amended in 2000 in response to *Daubert* and its progeny, particularly *Kumho Tire Co., Ltd.  v. Carmichael*, 526 U.S. 137 (1999). It is instructive to quote the Advisory Committee Notes:

> In *Daubert* the Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and the Court in *Kumho* clarified that this gatekeeper function applies to all

> expert testimony, not just testimony based in science. . . . Consistently with *Kumho*, the Rule as amended provides that all types of expert testimony present questions of admissibility for the trial court in deciding whether the evidence is reliable and helpful. Consequently, the admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.

On the question of the value of the *Megan T. Miller*, Claimant's brief focuses upon the "disparity" between the amount posted by Miller Marine as security and the "appraisal" reported by Stephen Richter. The security bond was in turn based upon the appraisal reported by Claudio Crivici. It follows that if the issue resulted in a hearing, the Court would have to decide whether both opinions were admissible (the gatekeeper function), and then choose one over the other, or designate a Court-appointed expert under Fed. R. Evid. 706.

The case at bar does not proceed beyond the first stage. Crivici's appraisal, as detailed in his sworn report, is admissible under the Rules of Evidence. His qualifications as a marine surveyor and appraiser are established by the professional organizations to which he belongs. Crivici visited, examined and appraised the *Megan T. Miller* as she lay afloat. While Crivici employs shorthand to express his opinion ("Based on my knowledge of the fair market value for vessels of similar size and characteristics as the "MEGAN T. MILLER," I value the vessel . . . "), his qualifications and experience entitle him to do so.

Rule 702 provides:"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion," but even then, only if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact" determine the particular fact in issue, Rule 702(a); "the testimony is based on sufficient facts or data," Rule 702(b);

and "the testimony is the product of reliable principles and methods," Rule 702(d).  Crivici and his appraisal satisfy all these criteria.  His appraisal would be admissible at a hearing.  Richter and his appraisal satisfy none of them.  His appraisal would not make it past the judicial gatekeeper.

I mean no disparagement of Captain Richter.  He tells us he is a "Master Mariner and Pilot" – ancient, honorable callings, demanding skill and courage – but his report makes no reference  to any experience as a marine surveyor or vessel appraiser.  For all the record reveals, he may have none.  Captain Richter's appraisal of the value of the *Megan T. Miller* contains no comments about or criticisms of Mr. Crivici's vastly different appraisal, prepared one year earlier.  One wonders if counsel for Claimant even showed the Crivici appraisal to Richter.  Crivici examined the *Megan* afloat.  Richter has never seen her.  Richter's report, which gives values for all three Miller vessels in question,  acknowledges that "[a ] vessel visit would allow me to determine  more exactly the actual condition of the vessels and its [*sic*] equipment in order to make a more definitive comparison and thus a more accurate appraisal as opposed to a range," but professes: "I am quite confident that each vessel has a value within the range I recommended," which in the case of the *Megan T. Miller* is between $700,000 and $1,000,000.  Doc. 37-7 at 2. Richter's confidence is apparently based upon these efforts:

> For comparisons I have studied numerous sites listing and selling comparable vessels.  I made comparisons to vessels listed for sale at Sun Machinery Corp., located in Oceanside, NY; TMT Marine Transportation, located in Harvey, LA; and Lee Felterman & Associates, located in Patterson, LA."

*Id.*  Values of vessels are frequently proved by contemporaneous actual sale prices of similar ships, at close to the same time and in the same geographic area.  A careful reading of Captain Richter's "comparisons" indicates that the dollar figures were generated by the amounts for which vessels were

"listed for sale," not by sales, and two of the three listings occurred in Louisiana, where life in its various forms and values can be somewhat different than one encounters along the shoreline of Connecticut.   Richter does not name the comparator vessels, or give the "listed for sale" amounts. Nor did Crivici's appraisal give such details with respect to comparator vessels; but as noted, Crivici's well-documented qualifications and experience entitle him to use professional shorthand.

In the light of these circumstances, I conclude that in the form it is submitted, Captain Richter's report on the value of the launch boat *Megan T. Miller* does not get past the Court's gatekeeper scrutiny.   Richter's qualifications and experience as a marine appraiser are not demonstrated.  The probative value of his report on that subject in its present form is minimal at best, and lacking in that element of trustworthiness sufficient to allow the Court to consider it as evidence of the values of the three Miller boats.  It follows that (1) the Richter report is not admissible in evidence and the Court will not consider it; and (2) the only evidence presently in the record with respect to the *Megan*'s value is Mr. Crivici's appraisal, which Judge Dearie approved in form and substance, and Miller Marine, in accordance with admiralty practice, used as the basis for the $515,000 security bond.

For the foregoing reasons, Claimants' motion to increase the value of the security based upon the value of the *Megan T. Miller* will be denied, without prejudice to renewal by Claimants, if so advised, on the basis of evidence in an admissible form that the valuation of the *Megan* is too low and should be increased by this admiralty Court, following due appraisement under Rule F(7).

**B.     Whether the Value of the Vessels *Abigail Miller* and *Erin E. Miller* Should be Added to the Limitation Fund**

Claimant's second contention on this motion is that the limitation fund posted by Miller

Marine should be increased by the value of the launch boats *Abigail Miller* and *Erin E. Miller*, "on the ground that each vessel was jointly and independently at fault for causing Captain Walker's injuries."  Motion [Doc. 37] at § 3.

Plaintiff Miller Marine's initial responsive contention is that none of its vessels (including the *Megan T. Miller*, from which Walker fell) was at fault, and Miller Marine bears no liability for the accident.  Thus, Plaintiff's first prayer in its complaint under the Limitation Act is that it be *exonerated* from liability.  Under the statute, *limitation* of liability is the alternative form of relief, which is available in respect of a vessel whose fault for an injury subjects her to *in rem* liability under maritime law.  In the case at bar, Walker was injured when he fell from the deck of the *Megan*, she being the last of the three Miller boats whose decks he crossed on his way to the ladder affixed to the wharf.  The immediate cause of the accident, on Claimant's theory of the case, is that unbeknownst to him, a portion of the *Megan*'s starboard, shoreside gunwale had been removed, and in the darkness, Walker fell through the resulting open space.  Miller Marine's complaint under the Limitation Act identifies the *Megan* as the vessel to which *in rem* liability might attach, and consequently seeks to limit that liability to the value of that vessel.  On the present motion, Miller Marine contends that there is no basis in law for requiring the values of the *Abigail* and the *Erin* to be added to the limitation fund.  Alternatively, Miller Marine contends that Claimant's effort to increase the fund on this basis is premature, and should await discovery and trial.

Disputes of this nature occur frequently in admiralty cases.  They reflect the distinctions in maritime law between a shipowner's liability *in personam* and the liability of the shipowner's vessel *in rem*, which may exist notwithstanding the absence of *in personam* liability on the part of the shipowner.  These principles are summarized by Professors Healy and Sweeney in *The Law of*

*Marine Collision* (Cornell Maritime Press 1998), at 14-15:

> Under American law, a negligently caused collision immediately impresses the offending vessel with an inchoate maritime lien, which may be perfected by the successful prosecution of an action *in rem* against her. Under English law, the prevailing view appears to be that a maritime lien is simply a security device; an action *in rem* will lie only when the shipowner is liable *in personam*. In the United States, on the other hand, the ship is personified, and for certain purposes is treated almost as a corporate entity. Thus, the ship may be held liable for the torts of those lawfully in charge of her, even under circumstances where her owner is under no liability. . . .[4] Any action against the vessel *in rem*, however, must be brought in a federal district court, and the court's admiralty jurisdiction must be invoked. This is so because an action *in rem* by a private party against a vessel (or other maritime property, i.e., cargo or freights) is a remedy wholly unknown to the common law, and was therefore not saved to suitors by the Judiciary Act of 1789, or its modern counterpart.

(footnotes omitted).  The Healy and Sweeney volume is concerned only with marine collision law, but the quoted principles are applicable to all cases of maritime tort involving a vessel, such as the case at bar.

When a casualty occurs, and several vessels of common ownership are present, the *in rem* liability of each vessel depends upon whether she did anything wrong, or to state the proposition in more traditional terms, whether she committed an offense of a nature and severity sufficient to impress her with a maritime lien.  In *United States v. SS Washington*, 241 F.2d 819, 825 (4th Cir. 1957), the Fourth Circuit said:

> It is well settled, of course, that where vessels operating together are at fault in a collision, each is responsible in rem for its proportionate part of the damage even though they belong to the same owner. *The Eugene F. Moran*, 212 U.S. 466 [(1909)].  It is equally well settled, however, that notwithstanding common ownership, in rem liability exists only with respect to a vessel which is at fault in the collision.

---

[4]  As in cases of compulsory pilotage and a vessel operating under a bareboat charter.

13

> *Liverpool, Brazil & River Plate Steam Nav. Co. v. Brooklyn Eastern Dist. Term.,* 251 U.S. 48 [(1919)]; *Sacramento Nav. Co. v. Salz*, 273 U.S. 326, 332 [(1926)].

241 F.2d at 825 (lateral citations omitted).[5]

The concept of a vessel as an *offender* whose *offense* creates a maritime lien upon her carries over into the law of limitation of liability.  In *Standard Dredging Co. v.  Kristiansen*, 67 F.2d 548 (2d Cir. 1933), Judge Learned Hand described the Supreme Court's decision in *Liverpool* as involving "the right to limit in a case where a tug brought her tow, a car float, into collision with a steamer, which sued the common owner of both in personam," and continued:

> The court proceeded in analogy with the privilege or lien of collision, and held that as no lien arose against the float – an innocent instrument – the owner might limit his liability by surrendering only the tug. . . . [W]e understand the decision as settling the law that in cases where the injury is to a third person, to whom the owner owes no duty based upon consent, he may limit his liability to the ship *against which a maritime lien would arise from the wrong* . . . .

67 F. 2d at 549 (emphasis added).[6]

As this quotation from *Kristiansen* suggests, admiralty courts in limitation cases distinguish between cases sounding solely in tort, where a shipowner owes to an injured third person "no duty based upon consent," and cases where the services of more than one vessel of common ownership are required to perform a contract between the shipowner and another party.  That distinction is illustrated by *In re United States Dredging Corp.*, 264 F.2d 339 (2d Cir. 1559),[7] where a shipowning company contracted with a town to dredge a harbor, and utilized for that purpose a non-self propelled

---

[5]  *Cert. denied sub nom., Texas Co. v. United States*, 355 U.S. 817 (1957).

[6]  *Cert. denied*, 290 U.S. 704 (1934).

[7]  *Cert. denied sub nom., U.S. Dredging Corp. v. Krohmer,* 360 U.S. 932 (1959).

dredge, the "Magic City," and several motor launches.  The launches took men working on the

dredge back and forth, and brought the dredge oil and other supplies necessary for the work.  While

one launch, the "Nip," was going to fetch an empty barge and push her alongside the dredge, she had

a flash fire causing deaths and personal injuries.   On the company's petition to limit its liability

under the Limitation Act, Judge Learned Hand posed the question thus:

> The only issue is whether the "Nip" is the only vessel that the
> appellant must surrender in order to limit its liabilities, or whether it
> must also surrender five other vessels, that were engaged in the same
> venture at the time.

204 F.2d at 339.  The district court held that the additional vessels had to be surrendered into the

limitation fund.  The Second Circuit affirmed.  Judge Hand observed that

> When the shipowner's liability presupposes no preceding consensual
> relation with the injured party, but arises from a base invasion of his
> interests, it can be safely asserted that the surrender of only *the
> damage feasant vessel* is necessary in order to secure limitation.

*Id.* at 340 (emphasis added).  But that was not the case before it; Judge Hand reasoned:

> Not only was the "Magic City" without power of propulsion, but the
> men who worked upon her had to be taken back and forth at night by
> the launches; her oil and other supplies to be brought to her by still
> other craft.  In short, all these attending "vessels" were necessary to
> the performance of their owner's contract with the town.

*Id*. at 341.

In the case at bar, the claims of Captain Walker and his spouse against Miller Marine sound

solely in tort.  Miller Marine had no contract with Walker.  If a contract relevant to this incident

existed between Miller Marine and some non-party to the action, the record does not reveal its nature

or terms.  Accordingly, the question of whether a particular Miller-owned boat must be surrendered

into the limitation fund comes down to this: Was that boat a "damage feasant vessel," to use Judge

Hand's elegant phrase in *United States Dredging Corp.,* which is to say, did her conduct or condition cause or contribute to the accident in a manner sufficient to impress a maritime lien upon her?

We have seen that when Walker fell into the waters of the port of New Haven and was injured, three Miller boats were on the scene: *Abigail, Erin* and *Megan.  Abigail,* operated by John Handley, a Miller Marine employee, had completed her task of transporting Walker from the Riverhead anchorage to the Miller Marine wharf facilities at New Haven.  Upon her arrival at New Haven, the *Abigail* tied up alongside the *Erin,* which was tied up alongside the *Megan*, which was next tied up next to the wharf and its access ladder.  When Walker began his ill-fated traverse of the three boats on his way to the wharf, the three Miller boats were all at rest, not under power, not navigating or being navigated in any way.  Walker fell into the water, he alleges, because a section of the *Megan*'s starboard gunwale, next to the wharf, was missing, creating the gap through which he fell.

Claimant's theory of the case is that this condition on the *Megan* constituted negligence as to Walker which proximately caused his fall and injury.  Whether the *Megan* (and her owner) owed a duty to Walker in respect of the condition of the *Megan*'s gunwale, or if a breach of that duty proximately caused Walker's injury, are questions that will be decided by a jury in the common law trial before Judge Shea.  For the purpose of this limitation proceeding in the admiralty, the condition of the *Megan*'s gunwale and the alleged mechanics of Walker's fall are sufficient to cast the *Megan* in the role of a damage feasant vessel, subject to a maritime lien in favor of Claimant, and potential *in rem* liability.

But what of the *Abigail* and the *Erin*, whose values Claimant contends should also be surrendered?  They were present at the scene of the casualty, but that is not enough to make them

16

liable *in rem* for Walker's fall.   In *Liverpool*, a car float was not only present at the scene of a collision with the steamship Vauban, she was the vessel that struck the steamship.  But the car float was attached at the time to the tug Intrepid, whose negligent navigation caused the collision.   The Supreme Court held that the value of the car float did not have to be surrendered in limitation:

> The car float  was the vessel that came into contact with the Vauban, but as it was a passive instrument in the hands of the Intrepid that fact does not affect the question of responsibility. . . . [[F]or the purposes of liability the passive instrument of the harm does not become one with the actively responsible vessel by being attached to it.

*Liverpool,* 251 U.S. at 52.  For this proposition, the Court cited, among other cases, *The Eugene F. Moran*, 212 U.S. 466 (1909), where a car float, whose tug negligently brought her into collision with another vessel, escaped liability for the collision. Justice Holmes said:

> There is a practical line and a difference in degree between the case where the harm is done by the mismanagement of the offending vessel and that where it is done by the mismanagement of another vessel to which the immediate but innocent instrument of harm is attached.

212 U.S. at 474.

     In *Liverpool*, the Court extended this principle to the limitation of liability context, and held that the value of a vessel which is "an immediate but innocent instrument of harm" need not be surrendered, since it "does not become one with the actively responsible vessel by being attached to it." 251 U.S. at 52.  In the case at bar, the *Abigail* and the *Erin* were not even the immediate instruments of the harm to Walker.  The *Megan* played that destructive role alone.  It was her defective gunwale through which Walker fell.  There was nothing wrong with the gunwales or railings of the *Abigail* or the *Erin.*  Walker traversed the decks of those boats without incident.  The three Miller boats were at rest, merely attached together, presumably for a night's repose before the

next work day began.  The *Abigail* and the *Erin* were not physical instruments of the harm to Walker. The Supreme Court's holdings and rationales in *Liverpool* and *The Eugene F. Moran*, which exonerated the vessels actually in collision with the victim because they were only passively attached to the vessel in fault, would seem to apply to this case *a fortiori*, and exonerate the *Abigail* and *Erin* from *in rem* liability for the accident befalling Captain Walker.  It necessarily follows that their values need not be surrendered in a limitation proceeding.

Claimant, arguing for the surrender of all three vessels, contends that Miller Marine breached a duty it owed to Walker "to provide a safe means of egress to the Wharf," and that fault for that breach "should be attributed equally" to the three Miller boats "because each vessel was attached to one another by Miller Marine as part of a unified 'bridge' that was negligently used by Miller Marine to provide Captain Walker access to the Wharf," a concept that Claimant concludes "renders all vessels equally at fault." Main Brief [Doc. 37-1] at 6-7.  It is an imaginative theory, but given the cited Supreme Court cases, the concept of a floating bridge falls well short of creating a maritime lien against every boat in the bridge to the wharf, whether passive and innocent (like the *Abigail* and the *Erin*) or defective and at fault (like the *Megan*).  For purposes of *in rem* liability, there is no discernible difference between an innocent tow in a tug-and-tow navigating unit and an innocent boat in a floating bridge.  Neither innocent vessel is liable *in rem*.  Neither needs be surrendered in the shipowner's admiralty action to limit its liability.

Other, related questions arise.  Claimant argues that "*Miller Marine* owed Captain Walker, as a passenger, business visitor, and invitee, a reasonable duty of care to assure that he could safely disembark from the Abigail Miller to access the Wharf under the circumstances of this case," and to carry out that duty, "*Miller Marine* should have provided Captain Walker with direct access to the

dock or, at least, it should have provided him with a safe means of acquiring access, such as a gangway or a floating platform." Brief at 6 (emphases added). If a trial jury indicates by its answers to a special verdict that such a breach of duty occurred, and was ascribable to Miller Marine (as a matter of company policy or practice) rather than to the captain of the *Abigail* (as the result of his decisions and conduct on the spot), then *quaere* whether Miller Marine's liability to the Walkers can be limited at all. In *Richardson v. Harmon*, 222 U.S. 96, 106 (1911), the Supreme Court characterized the limitation of liability statute as expressing "the policy of limiting the owner's risk to his interest in the ship in respect of all claims arising out of the conduct of the master and crew, whether the liability be strictly maritime or from a tort non-maritime, but leaves him liable for his own fault, neglect, and contracts." *See also Mediterranean Shipping Co. S.A. Geneva v. POL-Atlantic*, 229 F.3d 397, 403 (2d Cir. 2000) (collecting cases).[8]

In addition, the brief for Claimant asserts various kinds of independent fault on the parts of the *Aigail* and the *Erin*. For example, Claimant contends that "the Erin E. Miller is directly and independently at fault in causing his injuries because the vessel failed to have reasonably adequate and sufficient lighting to enable Captain Walker to observe the opening in the Megan T. Miller's starboard gunwale and to otherwise facilitate his egress from the Abigail Miller to the Wharf." Brief [Doc. 37-1] at 8. The question that arises is whether the *Erin E. Miller* had a duty to maintain lighting on board that vessel for the purpose of assisting persons like Walker in gaining access from the moored Miller boats to the wharf, so that a failure to do so renders the *Erin* liable *in rem*. That is a fact-intensive issue. *Cf.* the collision case of *The Eugene F. Moran*, 212 U.S. at 476: "The only

---

[8] I do not consider this question further, since the parties have not briefed it. The question may arise subsequently, if further proceedings in this limitation action prove to be necessary.

fault on the part of 18 D that is set out in the statement is the absence of a light; and it is said that 'therefore' it was a party to the common fault.  We doubt whether the conclusion follows from the premises.  When a duty is imposed for the purpose of preventing a certain consequence, a breach of it that does not lead to that consequence does not make a defendant liable for the tort of a third person merely because the observance of the duty might have prevented that tort."

I think it clear that the present record does not justify a Court order directing Miller Marine to increase the limitation fund by surrendering the values of the *Abigail Miller* and the *Erin E. Miller*.  That surrender is contingent upon Claimant demonstrating that the events in question give rise to maritime liens on these boats, with consequent *in rem* liability.  Given the established governing authority, I regard that as a doubtful proposition.  But the litigation is in its early stages.  There has been no discovery, in this admiralty case or the common-law case; and a full development of the facts will take place during a plenary common law jury trial before Judge Shea.

As the discussion in Part II.C., *infra*, points out, resolution by this Court of issues relating to the limitation fund can be deferred until the conclusion of the common law trial, and it is sensible to do so.  I do not agree with Miller Marine's contention that Claimant's present motion to increase the fund is "premature," if the word is intended to suggest that the motion should not have been made at all; Rule F allows a claimant to demand an increase in a limitation fund at any time.  But I do agree that it is the better practice for this Court to defer adjudicating these issues until we know the results of the common law trial.  It may be, for example, that the results of that trial will make it unnecessary for this Court ever to decide these interesting admiralty questions.   If the trial results in a defendant's verdict, or if the Walkers are awarded damages in an amount less than the presently posted admiralty security of $515,000, all these limitation fund questions become moot.   In

consequence, deferring deciding the admiralty questions until the conclusion of the common law trial may reduce litigation expense to the parties and conserve judicial resources.

In these circumstances, the remaining issue for this Court at this time is whether a procedure exists for allowing the Walkers' common law action against Miller Marine before Judge Shea to go forward. The question arises because that action is currently stayed under Judge Dearie's Limitation Act injunction, entered while this admiralty proceeding was still in the Eastern District of New York and remaining in effect after the transfer of the case to this District. I address that issue in the following Part.

**C.   Future Governance of the Case**

The case at bar presents the not unfamiliar juxtaposition between persons like the Walkers, intent upon obtaining a common law jury trial for injuries caused by or suffered on board a vessel, and the vessel's owner, intent upon limiting its liability pursuant to the admiralty law. The injured person invokes the saving to suitors clause: as do the Walkers. The shipowner invokes the Limitation Act: as does Miller Marine.

In *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438 (2001), the Supreme Court recognized that: "Some tension exists between the savings to suitors clause and the Limitation Act. One statute gives suitors the right to a choice of remedies, and the other statute gives vessel owners the right to seek limitation of liability in federal court." *Id*. at 448. The petitioner (plaintiff) in *Lewis* brought a Jones Act action for personal injuries suffered while working on respondent's ship. Expanding upon the tension between the relevant statutes, the Court said:

> In this case, there was a conflict between the saving to suitors clause and the Limitation Act. Petitioner sued respondent in state court; under the saving to suitors clause, that court had jurisdiction to

21

> hear his claims. Respondent sought limited liability for petitioner's claims in federal court; the Limitation Act granted the federal court jurisdiction over that action. Both parties selected legitimate forums for their claims, and therein lies the conflict.

*Id*. at 452.  The case at bar presents the same conflict.  The Walkers invoke the savings clause to press their common law claims under the federal court's diversity jurisdiction, rather in a state court, but that is a distinction without a difference in dealing with the statutory conflict.

The Supreme Court's mandate to federal district courts, articulated in *Lewis* and derived from earlier decisions of that Court, is to "reconcile petitioner's right to his remedy under the savings to suitors clause with respondent's right to seek limited liability under the Limitation Act." *Id.* at 451. The approach taken by the courts is to condition an injured party's right to invoke the savings to suitors clause, and sue in a common law court, upon the giving of stipulations that preserve a shipowner's right to limit any resulting liability in a federal admiralty court under the Limitation Act. The *Lewis* Court described and approved such an arrangement:

> In this case, petitioner stipulated that his claim for damages would not exceed the value of the vessel and waived any claim of res judicata from the state court action concerning issues bearing on the limitation of liability. The District Court concluded that these stipulations would protect the vessel owner's right to seek limited liability in federal court. Then, out of an "abundance of caution," the court stayed the limitation proceedings so that it could act if the state court proceedings jeopardized the vessel owner's rights under the Limitation Act. We believe nothing more was required to protect respondent's right to seek a limitation of liability.

531 U.S. at 453-454 (citation omitted).

The facts in *Lewis* differ from those in the case at bar in one respect.  The injured individual in *Lewis* "stipulated that the value of his claim was less than the value of the limitation fund, recanting his earlier allegation that his claim exceeded the vessel's value." *Id.* at 442.  Implicit in that

stipulation was an agreement by the injured claimant that the posted limitation fund was adequate and need not be increased. The Walkers do not presently offer such a stipulation. Thomas Walker's injuries are alleged to be grave, and as Claimant in this proceeding, he seeks to increase the limitation fund in two ways: challenging the posted amount of the *Megan*'s value as inadequate, and seeking the surrender of the values of the *Abigail* and *Erin*.

As noted *supra*, these disputes continue unresolved. But their pendency does not prevent this Court from approving, as did the district court in *Lewis*, appropriate stipulations which reconcile the savings to suitors clause and the Limitation Act, and protect the legitimate interests of all parties. That salutary ability on the part of a district court sitting in admiralty is illustrated by the Fourth Circuit's decision in *Norfolk Dredging Co. v. Wiley*, 439 F.3d 205 (4th Cir. 2006), *cert. denied*, 549 U.S. 881 (2006). A crewman on a dredging company vessel was injured and filed a Jones Act jury case in state court, seeking $1.25 million in damages. The dredging company-shipowner filed a federal limitation action, seeking to limit its liability to $80,000, the asserted value of the *Pusher # 10*, the vessel on which the crewman was injured. The limitation court enjoined all other suits. The crewman, Wiley, filed a motion in federal court to increase the limitation fund, alleging that at the time of the accident "four vessels were working together; all were owned by Norfolk Dredging; and all were contractually engaged in a common enterprise under a single command." 439 F.3d at 207 (footnote omitted). By that allegation, Wiley sought to invoke the "flotilla doctrine" applicable to limitation cases involving the performance of a shipowner's contractual obligations. The Fourth Circuit describes what next transpired in the case:

> Wiley also filed a motion to dissolve the injunction and stay the
> federal proceeding to allow him to pursue his claim under the Jones
> Act before a jury in state court. To support his motion, Wiley

stipulated (1) that the district court had exclusive jurisdiction to decide all Limitation of Liability issues; (2) that the value of the Pusher # 10 was $80,000, reserving his contention that the limitation fund should also include the value of the other three vessels pursuant to the flotilla doctrine; and (3) that he was the only claimant with respect to the November 27, 2003 incident. He also assured the court that he would not make any *res judicata* argument based on a judgment in state court that he might obtain and that he would not seek to enforce any such judgment in excess of the limitation fund as determined by the district court.

*Id*.

The district court concluded that "Wiley's stipulations and undertakings would adequately protect Norfolk Dredging's Limitation of Liability right and accordingly granted Wiley's motion to dissolve the injunction, staying the federal proceeding to permit Wiley to pursue his Jones Act claim in a separate action before a jury in either state or federal court." *Id.* at 207-208. The district judge also denied Wiley's motion to increase the limitation fund under the flotilla doctrine, but stated an agreement "to reconsider the flotilla  doctrine agreement if Wiley's Jones Act judgment were to exceed $80,000 and Wiley again filed the motion to increase the fund." *Id*. at 208.

Norfolk Dredging appealed the dissolution of the Limitation Act injunction it had obtained. The Fourth Circuit rejected the appeal.  It cited *Lewis,* "the Supreme Court's most recent visit to this issue," and reasoned that Wiley, in providing the indicated stipulations to the district court, "agreed to the same stipulations that were presented to the district court in *Lewis* except as to the specific value of the limitation fund." *Id.* at 209-10. That absence, Norfolk Dredging contended, made Wiley's stipulations inadequate to protect its Limitation of Liability claim.  The Fourth Circuit was not persuaded:

Norfolk Dredging has not, however, demonstrated to us how the failure of Wiley to agree to the *amount* of the limitation fund

> prejudices its Limitation of Liability right. Stipulating that the fund, whatever its amount, is the limit of Norfolk Dredging's liability insulates Norfolk Dredging from overpaying just as would a stipulation to its precise amount. We cannot see how saving for another day the question of Norfolk Dredging's amount of liability prejudiced its general right to limit liability. All the district court did in this case was effectively to postpone, and thereby possibly avoid, resolving the novel question whether to apply the flotilla doctrine to determine the size of the limitation fund.

*Id.* at 210.

That common-sense approach applies with equal force to the Walkers' additional refusal, in the case at bar, to accept Miller Marine's appraisal of the value of the offending vessel, the *Megan T. Miller*. That issue, which also affects only the *amount* of the limitation fund, may with equal facility be saved for another day, *viz.*, the conclusion of the common law trial. Indeed, the Fourth Circuit in *Norfolk Dredging* cited with approval the Fifth Circuit's opinion in *Two "R" Drilling Co. v. Rogers*, 943 F.2d 576 (5th Cir. 1991), where, in the Fourth Circuit's phrasing, "the Fifth Circuit approved the district court's decision to dissolve an injunction to allow state proceedings to continue even though the parties could not agree on the values of either of the two vessels in dispute." 439 F.3d at 210 (citing *Two "R" Drilling*, 943 F.2d at 578). The Fourth Circuit continues its description of this Fifth Circuit case:

> The claimant stipulated to federal jurisdiction, waived application of *res judicata* principles, and agreed not to enforce any state judgment exceeding the limitation fund, which was initially constituted according to the shipowner's stated value of the two vessels, until the federal court could resolve the value of the ships. The Fifth Circuit, as well as the district court before it, held that these stipulations, even in the absence of a final determination of the fund's amount, were sufficient to protect the shipowner's right to limit liability.

439 F.3d  at 210-211.  Confronted by comparable stipulations by the claimant in *Norfolk Dredging*,

25

the Fourth Circuit held:

> The district court acted well within its discretion in staging the proceedings by staying this action and allowing a state court action to proceed, postponing until later the final determination of what the precise amount of the limitation fund should be.

*Id.* at 211.

I propose to exercise the same discretion in the case at bar.  The cases just cited are from other circuits; the Second Circuit does not appear to have addressed the subject since the Supreme Court decided *Lewis*, which I read as giving trenchant instructions to the lower admiralty courts.  I am unaware of Second Circuit authority of any vintage contrary to the holdings and rationales of the Fourth Circuit in *Norfolk Dredging* and the Fifth Circuit in *Two "R" Drilling.*  On the contrary: in *Kreta Shipping, S.A. v. Preussag International Steel Corp.*, 192 F.3d 41 (2d Cir. 1999), which preceded *Lewis* by two years, the Second Circuit affirmed the district court's lifting of a limitation injunction to allow cargo interests to pursue claims in foreign forums, after one claimant "filed a stipulation executed on behalf of all the claimants against Kreta to the effect that the aggregate of their claims did not exceed Kreta's maximum liability under the Limitation Act."  192 F.3d at 46.  In this regard, the Second Circuit's decision in *Kreta Shipping* foretold the Supreme Court's decision in *Lewis;* and in *Lewis,* the Court cited *Kreta Shipping* with evident approval.  531 U.S. at 451.

Claimant in the instant case touches on this subject when he contends in his Reply Brief [Doc. 62] at 4 that "the Court should not require Claimant to stipulate to the current amount of the limitation fund"; rather, "the Court must allow the Claimant to stipulate to the Court's jurisdiction over the limitation fund rather than requiring him to stipulate to the current amount of the fund."  If these contentions are intended to suggest that the Court should fashion stipulations for a party such

26

as the Claimant, there is a confusion of roles.  Courts write opinions and file them.  Parties (with the aid of counsel) write stipulations and offer them.

If Captain and Mrs. Walker, the Claimants in this case (I revert to referring to them in the plural)  wish this federal admiralty court to lift the Limitation Act injunction obtained by Miller Marine, so that the Walkers may proceed with the diversity-based common law action they have commenced against Miller Marine before Judge Shea, then counsel for Claimants, after considering this Ruling and the cited cases, must proffer a stipulation or stipulations executed by the Walkers which are sufficient to protect Miller Marine's right to limit its liability under the Limitation Act.  If Miller Marine regards those stipulations as sufficient for that purpose, then presumably the injunction will be lifted, on consent and without prejudice to further litigation in this Court, in case of need, with respect to limitation issues.  If Miller Marine regards Claimants' proffered stipulations as inadequate to protect its admiralty interests, the Court will resolve the question, and exercise its discretion to lift the injunction or leave it in place.  The present point is that it is up to the Claimants, advised by counsel, to proffer such stipulations as they are willing to give.  Miller Marine is entitled to evaluate and comment upon any stipulations proffered to them.

If the Court lifts the admiralty injunction, it will stay proceedings in this action until the common law case before Judge Shea has been concluded.  If the Walkers fail to recover a judgment against Miller Marine in excess of $515,000, this Limitation Act action will be dismissed as moot.  If the Walkers recover a judgment in excess of that presently posted limitation amount, this Court will lift the stay in these proceedings and proceed to adjudicate "all Limitation of Liability issues," to quote the Fourth Circuit's phrase in *Norfolk Dredging.*

Should that latter eventuality come to pass, the Limitation of Liability issues that may need to be adjudicated by this Court include:

* A due appraisement of the value of the *Megan T. Miller.*

* A determination of whether the values of the *Abigail Miller* and the *Erin T. Miller* must be surrendered, and if so, in what amounts.

* Whether the Limitation Act applies at all to Miller Marine's liability to the Walkers.

* Assuming the Limitation Act would otherwise apply to the case, whether Miller Marine is barred from claiming the benefits of the Act because the accident occurred with the privity or knowledge of the shipowner.[9]

In their most recent communication, counsel for Claimants express an urgent desire to move this case forward.  Counsel may accomplish that wholly understandable purpose by filing the stipulations contemplated by this Ruling as promptly as may be reasonably possible.

 When they are at hand, the Court will set a schedule for further submissions with respect to the proffered stipulations and the future governance of the case.

If no such stipulations have been submitted by **August 18, 2014**, the Court will inquire of counsel about the status of the case.

---

[9]  To be subject to limitation of a shipowner's liability under the Limitation Act, the injury complained of must have been incurred "without the privity or knowledge of the owner."  46 U.S.C. § 30505(b).

### III.   CONCLUSION

For the foregoing reasons, the motion of Claimants Thomas Walker and Gail Walker [Doc. 37] to Increase the Limitation fund and the Posted Security is DENIED, without prejudice to renewal in the circumstances and manner provided in this Ruling.

It is SO ORDERED.

Dated:   New Haven, Connecticut
          June 17, 2014


                                        /s/Charles S. Haight, Jr.
                                        CHARLES S. HAIGHT, JR.
                                        Senior United States District Judge